765 F.2d 253
 18 Fed. R. Evid. Serv. 754
 UNITED STATES of America, Appellee,
v.
Anthony ANELLO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Daniel DUVAL, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
James Michael OLIVER, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
David ROOT, Defendant, Appellant,
UNITED STATES of America, Appellee,
v.
John SACHS, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Fred R. VERDERAME, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Walter WENDOLKOWSKI, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Gervasio GUILLEN, a/k/a Jorge Ortiz-Germasio, Defendant, Appellant.
 Nos. 84-1406 to 84-1412 and 84-1452.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 7, 1985.
Decided June 20, 1985.
As Modified On Denial of Rehearing Aug. 21, 1985.
 
 Richard R. Booth, Miami, Fla., on brief for Walter Wendolkowski.
 Lillian A. Wilmore, Boston, Mass., with whom James W. Lawson, Oteri, Weinberg & Lawson, Boston, Mass., Marshall A. Stern, and Stern & Goldsmith, Bangor, Me., were on brief for David Root.
 George R. Goltzer, New York City, with whom Goltzer & Adler, New York City, was on brief for John Sachs.
 Ira N. Loewy, Miami, Fla., with whom Edward R. Shohat and Bierman, Sonnett, Shohat & Sale, P.A., Miami, Fla., were on brief for Gervasio Guillen.
 Arthur E. Huttoe, Miami, Fla., on brief for Anthony Anello, Daniel Duval and Fred Verderame.
 Jay P. McCloskey, Asst. U.S. Atty., Bangor, Me., with whom Richard S. Cohen, U.S. Atty., Portland, Me., was on brief for appellee.
 Before BREYER and TORRUELLA, Circuit Judges, and PETTINE,* Senior District Judge.
 BREYER, Circuit Judge.
 
 
 1
 These appeals arise out of an indictment charging nineteen persons with conspiracy to possess over a thousand pounds of marijuana with an intent to distribute the drugs. See 21 U.S.C. Secs. 841, 846. The government basically claimed that the conspirators were important suppliers, wholesalers, or retailers of marijuana, who, during June and July 1982, bought or sold among themselves (and with others) a large store of marijuana, smuggled into the country and kept near Bangor, Maine. Of nineteen individuals indicted, four pleaded guilty, and four others remained at large during the consolidated trial of the remaining eleven. A jury acquitted two and convicted nine. Eight of those nine now appeal.
 
 
 2
 After reviewing the extensive record below, we have concluded that the district court rulings at issue were all legally correct. In reaching this conclusion, we have not had to decide any novel question of law; rather, we have simply satisfied ourselves on the basis of the record that the district court's rulings are sufficiently supported by well-established legal precedents. Under these circumstances, we see no need to set forth all the complex facts of this case in detail here. Nor need we write an elaborately detailed opinion. We shall write enough simply to reveal to the parties the basic reasoning underlying our decision.
 
 
 3
 1. Speedy Trial Act Violations.
 
 
 4
 All eight appellants claim that the district court ought to have dismissed the indictment for violations of the Speedy Trial Act, 18 U.S.C. Secs. 3161 et seq. That Act requires that a trial "shall commence within seventy days" from the time of the indictment or arraignment, whichever is later. Id. Sec. 3161(c)(1). Otherwise "the information or indictment shall be dismissed on motion of the defendant." Id. Sec. 3162(a)(2). The 70-day period can be extended, however, by certain "periods of delay" that are specifically excluded from the day-count. Id. Sec. 3161(h); see United States v. Jodoin, 672 F.2d 232, 236 (1st Cir.1982).
 
 
 5
 In this case all parties agree that the speedy trial clock began to run on August 2, 1982. It stopped 568 days later, on February 1, 1984, when the jury was impanelled. In deciding how many of these 568 days are excludable, we find applicable here our holding in United States v. Rush, 738 F.2d 497, 503 (1st Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1355, 84 L.Ed.2d 378 (1985), that "an exclusion applicable to one defendant applies to all codefendants." We consequently find that a sufficient number of the 568 days were properly excluded from the speedy trial count to make the trial timely.
 
 
 6
 The 568-day period can be broken down for present purposes as follows:
 
 
 7
 a. August 2, 1982--November 26, 1982. Appellants do not contest the exclusion of this block of time, during which they were engaged in collateral proceedings before another district judge attacking the lawfulness of the grand jury and foreperson selection procedures. During this period, defendants filed motions, conducted discovery, and participated in hearings on the grand jury issue, which was ultimately resolved against them. This time was plainly excludable, as the trial court held. See 18 U.S.C. Sec. 3161(h)(1) (excluding delay from "other proceedings"); United States v. Hawker, 552 F.Supp. 117, 123-24 (D.Mass.1982).
 
 
 8
 b. November 27, 1982--February 7, 1983. This period falls within Sec. 3161(h)(1)(F), which excludes
 
 
 9
 delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion.
 
 
 10
 The defendants lost their motions attacking the grand jury's composition on November 26, 1982. United States v. Abell, 552 F.Supp. 316 (D.Maine 1982). By that time they had filed approximately seventy pretrial motions with the trial court, many of which raised complex suppression issues. The court had decided to postpone consideration of these motions until after resolution of the grand jury issues. (Had the grand jury motions been decided in defendants' favor, the other motions would have become moot. Cf. United States v. Gonsalves, 735 F.2d 638, 640 (1st Cir.1984).) The court then had to sort through and to analyze these many pending motions, determine which ones could be decided without a hearing, decide them, and set the others for hearing. On December 28, it decided those motions that did not require a further hearing. At the same time, it set a hearing date of February 7 for the remaining motions and framed the issues to be addressed at the hearing. The forty-one day delay between the scheduling of the hearing and the proposed hearing date was necessary because the attorneys needed additional time to prepare to address the issues that the court had framed, and because some defendants initially lacked individual counsel, see United States v. Foster, 469 F.2d 1 (1st Cir.1972). The district court found the entire period of time from November 27 to February 7 to be a "reasonably necessary" delay between the time of filing pretrial motions and the hearing upon those motions. United States v. Mitchell, 723 F.2d 1040, 1047 (1st Cir.1983). We agree, and we add that in the context of the case, the trial court's procedure seems reasonable enough on its face to obviate any need for a "contemporaneous" written explanation. See Mitchell, 723 F.2d at 1047-48.
 
 
 11
 c. February 7, 1983--June 2, 1983. This period of time is also excludable under Sec. 3161(h)(1)(F), quoted above. As we pointed out in Mitchell, the end of the hearing (for 'speedy trial' purposes) takes place after the court has received "all forthcoming briefs." Id. at 1046 (quoting Massachusetts District Court Plan). The suppression hearings here ran from February 7 to February 15, and the final, related briefs were not presented to the court until June 2.
 
 
 12
 d. June 3, 1983--November 4, 1983. The district court took 155 days from the time all briefs were submitted until the time it decided the relevant suppression motions. The court had many such motions under consideration. Although it would be difficult to arrive at an exact tally, we note that a large number of the seventy-odd pretrial motions originally filed had not been disposed of by the court's December 28 opinion, and therefore remained to be decided; at the suppression hearing, virtually every defendant raised at least one suppression issue, and many defendants pressed several issues. The suppression motions were individually, as well as collectively, filed. They were complicated. The court felt compelled to engage in legal research not covered in the parties' briefs. Eventually, it released a 115-page opinion comprehensively analyzing the relevant arguments and issues and disposing of the motions. We believe that, under these circumstances, the elapsed time from submission to decision was not unreasonable.
 
 
 13
 Two different statutory exemptions arguably apply to exclude this reasonably elapsed time. The first, Sec. 3161(h)(1)(J) excludes
 
 
 14
 delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.
 
 
 15
 Although this provision contains language that limits the excluded period to thirty days, the Seventh Circuit has recently held that the language does not apply literally when a court is asked to decide many motions submitted at the same time. United States v. Tibboel, 753 F.2d 608, 611-12 (7th Cir.1985). As a practical matter, it may be impossible for a court to decide 10 or 100 motions, all within the same thirty-day period. Nor is a court likely to grant a continuance when no one has asked for one. See 18 U.S.C. Sec. 3161(h)(8). Thus, we suspect the Seventh Circuit was correct in holding that a "reasonable promptness" requirement applies in such circumstances--a requirement that is satisfied here. Tibboel, 753 F.2d at 612.
 
 
 16
 We need not decide this question definitely, however, for this period of time is also excludable under Sec. 3161(h)(1)(F) quoted above. In late April 1983, two defendants made additional motions, which were pending throughout the 155-day period. Because these new motions raised issues that would turn on the court's resolution of some of the other suppression motions, the district court postponed a hearing on these new motions, and a decision upon them, until it had disposed of the other suppression motions before it with its 115-page opinion. Since the court did not unreasonably delay decision upon the original suppression motions, this delay in deciding the new motions was not unreasonable. This same period of time thus counts as part of a reasonable delay needed to decide the new, different motions with reasonable promptness. It is therefore excludable under (F) as
 
 
 17
 such delay as is reasonably necessary from the time of filing of a pretrial motion to the time of concluding a hearing on it or completing submission of the matter to the court for decision.
 
 
 18
 Mitchell, 723 F.2d at 1047. Of course, Mitchell calls for a "reasonably contemporaneous" statement of reasons underlying any unusual delay under (F). Mitchell, however, was not issued until December 29, 1983. The district judge here, therefore, was not subject to the "reasonably contemporaneous" statement requirement of Mitchell because he could not have been aware of it. United States v. Ferris, 751 F.2d 436, 439 n. 1 (1st Cir.1984) (Mitchell requirement of "reasonably contemporaneous" statement of reasons prospective only). We also note that the parties did not ask for such a statement at the time, that the reasons are obvious on the face of the record, and the district court provided such a statement as soon as the parties raised the "speedy trial" question. Under the circumstances, there is no reason for retroactively applying the Mitchell requirement.
 
 
 19
 e. November 4, 1983--December 5, 1983. After the district court released its 115-page opinion, it set a hearing on the remaining motions for December 5. Since the parties had to focus upon the remaining issues in light of the 115-page opinion and to prepare for the further hearing, the delay is obviously reasonable under (F) and Mitchell, supra.
 
 
 20
 f. December 5, 1983--February 22, 1984. This time is excluded pursuant to waivers signed by defendants showing that defense counsels' scheduling problems required further postponements.
 
 
 21
 In sum, we find that the Speedy Trial Act was not violated. The delay from indictment to trial was long. But, at least some of the different defendants, tried together, are responsible for each individual portion of that long delay. To say this is not to blame the defendants. They had every right to ask for pretrial decision of many complicated motions. Yet, there is no way both to provide them with such decisions and a fair chance to argue their motions and also to bring about a speedy trial. In resolving this dilemma, the district court, in our view, kept within the legal requirements of the Act. We also note a possible unfairness to any one codefendant who did not wish to participate in the pretrial motions of the others. This unfairness, however, arises not out of any improper action by the district court, but rather out of efforts to apply this Act, possibly drafted with the case of a single defendant in mind, to a highly complex, multi-defendant conspiracy trial. See Rush, supra. Regardless, we find no legal error in the district court's denial of defendants' speedy trial dismissal motions.
 
 
 22
 2. Juror Misconduct.
 
 
 23
 All eight appellants complain of the manner in which the district court handled two instances of alleged juror misconduct. The first consisted of a remark made by one juror to another just after the prosecution concluded in its closing argument, to the effect that "they're all guilty anyway." Defense counsel, overhearing the remark, brought it to the attention of the court, which then individually questioned each juror about it under oath in camera. The judge concluded that alternate juror # 3 made the remark in the presence of regular juror # 3, alternate # 4, and possibly also alternates # 1 and # 6. he dismissed these jurors, but he denied a mistrial, finding
 
 
 24
 there is no indication of any juror misconduct on the part of any of these jurors; there is no indication that anything was said by or within the hearing of any of these jurors about the innocence or guilt of any defendant; ... [t]he alleged juror misconduct has not reached, tainted, or affected [the other jurors and alternates] in any way; nor is there any other indication that any of these jurors is other than willing and able, indeed determined, to maintain an open, unbiased, impartial and fair mind in determining the innocence or guilt of each and every defendant.
 
 
 25
 Appellants claim that, since the misconduct may have prejudiced some jurors, the court had to grant their motion for a mistrial. We do not agree. Here, the district judge investigated the matter promptly and thoroughly. He made specific factual findings. He dismissed the jurors who might have been prejudiced. See United States v. Richman, 600 F.2d 286, 295-96 (1st Cir.1979) (declining to require mistrial where district court dismissed only juror possibly tainted by misconduct); United States v. Corbin, 590 F.2d 398, 400-01 (1st Cir.1979) (same); United States v. Kelly, 722 F.2d 873, 881 (1st Cir.1983) (same), cert. denied, --- U.S. ----, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984). The court's conclusion that the remaining jurors were not prejudiced and that they would maintain "an open, unbiased, impartial, and fair mind in determining the innocence or guilt of each and every defendant" is a reasonable conclusion to draw on the basis of the record. That being so, there is no legal reason for requiring a new trial. Defendants received the trial by an unbiased jury to which the Constitution entitles them.
 
 
 26
 Second, during the course of the in camera questioning the court became aware that alternate juror # 3 had seen regular juror # 3 using a calculator, apparently to determine how much money defendants might make from their drug transactions. The court dismissed both jurors, but it did not ask the other jurors about the incident. Appellants, citing Richman, supra, and United States v. Doe, 513 F.2d 709 (1st Cir.1975), claim that the court ought to have investigated the matter further.
 
 
 27
 Our 'jury misconduct' cases, however, while requiring the trial court to "conduct a full investigation to ascertain whether the alleged jury misconduct actually occurred," Doe, 513 F.2d at 711-12, also recognize
 
 
 28
 the 'discretion [of the trial court] to determine the extent and type of investigation requisite to a ruling on the motion [for mistrial.]'
 
 
 29
 Id. at 712 (quoting Tillman v. United States, 406 F.2d 930, 938 (5th Cir.1969) ). We have noted that the "district court has broad, though not unlimited, discretion to determine the extent and nature of its inquiry into allegations of juror bias". Corbin, 590 F.2d at 400. We find no abuse of that legal power here.
 
 
 30
 For one thing, the district judge conducted a sufficiently thorough investigation to determine whether the alleged episode of misconduct--the use of the calculator--in fact occurred; and, he dismissed the two jurors involved. Further, the court had no clear indication that any other jurors had seen the incident. No one else mentioned it. All of the others specifically denied they had heard any improper discussions in the jury room. And all the others swore they could remain open minded. The trial court might reasonably have concluded that to question these other jurors more specifically about the incident--in the absence of good reason to believe they had witnessed it--might, by drawing their attention to it, "do more harm than good," id., at 401.
 
 
 31
 Thus, here too, we conclude that all the appellants received the trial by an unbiased, impartial jury to which the Constitution's Sixth Amendment entitles them.
 
 
 32
 3. Probable Cause for Arrest.
 
 
 33
 Appellant Gervasio Guillen argues that the district court should have suppressed certain evidence, found on his person when he was arrested, because, in Guillen's view, the DEA arrested him without "probable cause" to believe that he had committed a crime. Draper v. United States, 358 U.S. 307, 310-11, 79 S.Ct. 329, 331-32, 3 L.Ed.2d 327 (1959). The evidence suggesting "probable cause" in the DEA's possession at the time of Guillen's arrest consisted of the following:
 
 
 34
 (a) DEA agent Michael Cunniff overheard conspirators in Hilton room 902 discussing "Cubans" on several occasions, and was able to deduce, based on his drug enforcement expertise, that Cubans were suppliers of the marijuana. (Guillen is a Cuban.)
 
 
 35
 (b) Moments after the car of coconspirator George Veillette (an important seller) was seen in front of room 7 of the Spring Fountain Motel, on July 1, DEA agent Mona Polen (who eventually arrested Guillen) observed Guillen standing in front of room 7. Shortly thereafter, another DEA agent saw two other individuals "who appeared to be Cuban" standing in front of room 7. He followed them to a local restaurant, where he heard them speaking Spanish.
 
 
 36
 (c) That evening Polen saw Guillen, with coconspirators George Valdes and Fernando Lopez, visiting Hilton room 701--a room registered to coconspirator Walter Wendolkowski (another important seller). Room 701 was a major hub of conspiratorial activity that weekend--virtually all defendants visited room 701 at some time during that weekend. During Guillen's visit, Polen heard one of three visitors say, with a Spanish accent, "Hey, O.J." (a nickname of Wendolkowski).
 
 
 37
 (d) Polen overheard coconspirator Robert Byers (yet another important seller, who eventually pleaded guilty and testified for the government at trial) referring to "Cubans" that evening.
 
 
 38
 (e) Agent Cunniff overheard Wendolkowski in room 902 say that "I have four Cubans ... the old man, one worker and a kid ... Mike is at the stable, he has two Cubes with him" (emphasis added). (Guillen is an elderly man.)
 
 
 39
 (f) On July 4, police learned that Mike Oliver, who had earlier stayed with Wendolkowski in Hilton room 701, had moved to room 23 of the Stable Inn. That evening, Cunniff sent other officers to the Stable Inn to find Oliver. The hotel clerks told police that Oliver had two rooms (23 and 30) registered in his name. The police entered Oliver's room and asked him whether he had another room. Oliver denied this, but when the police confronted him with the information they had obtained from the hotel, Oliver said his father-in-law was staying in room 30. Then Oliver said he did not want to talk anymore.
 
 
 40
 (g) Agent Polen surveilled room 30, and saw Guillen, Valdes, Lopez, and two women enter the room. She recognized Guillen from the Spring Fountain Motel, and Hilton room 701. She also recognized Lopez and Valdes from room 701. The three men were arrested.
 
 
 41
 Under these circumstances, we believe that government officials did have sufficient individual probable cause. The myriad references to "Cuban" suppliers; the fact that Guillen was seen at three different hotel rooms in three different hotels (the Spring Fountain, the Hilton, and the Stable) connected with three different conspirators (Veillette, Wendolkowski, and Oliver); the fact that he fit the description of a latin-looking "old man" staying with "Mike" at the "stable"; his association with other latin-looking individuals (Valdes and Lopez) who fit the description of the other "Cubans" staying with "Mike" at the "stable"--individuals who had also been seen in Hilton room 701; the fact that all three were apparently staying in room 30 registered to conspirator Mike Oliver; the prevarications in Oliver's story to the police--all these factors add up to "probable cause" to believe Guillen was one of the conspirators. See United States v. Vargas, 633 F.2d 891 (1st Cir.1980) (finding individual probable cause where police observed meeting of four individuals and had independent reason to believe that three were engaged in narcotics dealings with each other); United States v. Young, 598 F.2d 296, 304 (D.C.Cir.1979) (Robinson, J., concurring) (finding of probable cause supported by fact that defendant "had consorted not with one highly questionable companion but two" in different geographic areas over an "appreciable period" of time).
 
 
 42
 4. Guillen's Passport and Booking Card.
 
 
 43
 Appellant Guillen claims that the district court should not have allowed into evidence his passport or information from his arrest booking card, both of which showed that he was Cuban. Guillen's 'passport' argument rests upon the claim that its admission deprives him of his Fifth Amendment right not to be compelled to incriminate himself. He gave the passport, he says, to a federal magistrate only to obtain bail. And, he adds, he should not be forced to give up Fifth Amendment rights in order to secure his Eighth Amendment right to bail.
 
 
 44
 The flaw in this argument, however, is its assumption that the Fifth Amendment protects Guillen's passport. A passport is not a personal document. The government can seize or (where there is no doubt about its existence) subpoena it. Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The Second Circuit has held a passport admissible evidence under precisely similar circumstances. United States v. Praetorius, 622 F.2d 1054, 1062-63 (2d Cir.1979), cert. denied sub nom. Lebel v. United States, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). And, we follow that holding here. Since the passport showing Guillen's Cuban nationality was properly admitted, any error in admitting the booking information (which showed the same thing) was harmless beyond reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Fed.R.Crim.P. 52(a).5. Telephone Messages.
 
 
 45
 Guillen objects to the admission of two handwritten messages found in a waste basket in the "Motorcycle Shoppe" of George Veillette, one of the principal conspirators. The messages were addressed to "George"; one said "Cubins [sic] called 5:05," and the other said "The Cubans Cubins [sic] called, 5:05." Guillen says these messages amounted to inadmissible hearsay.
 
 
 46
 The government submitted a brief to the trial court before it presented this evidence, however, in which it said it intended to use these messages for a 'nonhearsay' purpose. The government intended to show membership in the conspiracy in part by showing the defendants' knowledge of each other, and it believed the messages relevant in this regard.
 
 
 47
 There is considerable case authority for the proposition that "notations of names, addresses, phone numbers and the like written on slips of paper or entered in address books" are not hearsay when "offered to connect the bearer or owner to the person indicated." 4 D. Louisell & C. Mueller, Federal Evidence Sec. 417.3 (1980). See United States v. Day, 591 F.2d 861, 883-85 (D.C.Cir.1978) (admitting slip of paper listing names and phone number of defendants where slip was not offered to prove that defendants in fact had such phone numbers, but for nonhearsay purpose of showing an association between victim and defendants named on slip); United States v. Ruiz, 477 F.2d 918, 919 (2d Cir.) (admitting slip of paper with defendant's name and a telephone number, where slip was introduced to show that co-conspirator bearer of slip knew the defendant "and anticipated calling him on the telephone"); cert. denied, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973); United States v. Ellis, 461 F.2d 962, 970 (2d Cir.) (admitting address book listing names as nonhearsay "circumstantial evidence showing association" among defendants), cert. denied, 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972); United States v. Mazyak, 650 F.2d 788, 792 (5th Cir.1981) (admitting letter for nonhearsay purpose of showing association among defendants); United States v. Canieso, 470 F.2d 1224, 1232 (2d Cir.1972) (Friendly, C.J.) (similar). The theory of these cases evidently is that the notations are relevant to show knowledge of the person mentioned in the notation and that this knowledge, not the truth or falsity of the notation, tends to prove the connection. That theory, and these cases, provide sufficient authority for admitting the notations about the Cubans' phone call. Given the government's theory of admission, the truth or falsity of the notations was beside the point. But cf. United States v. Hensel, 699 F.2d 18, 31 (1st Cir.), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983). Of course, the jury might have taken the evidence as showing that the Cubans in fact called Veillette, thereby using the evidence as government hearsay. See Canieso, 470 F.2d at 1232. Still, given the relevant nonhearsay use, and the fact that the defendant could have obtained a limiting instruction, we do not believe admission of the evidence went beyond the district court's typically broad legal power to control the admission of evidence. United States v. Drougas, 748 F.2d 8, 24 (1st Cir.1984).
 
 
 48
 6. Sufficiency of the Evidence.
 
 
 49
 Appellant David Root argues that the evidence was insufficient to convict him of joining in a conspiracy to possess the marijuana with an intent to distribute it. The relevant conspiracy was one to distribute the large amount of marijuana stored in Bangor, Maine through a series of sales, taking place in July in Bangor, to various marijuana distributors. We assume here that those buyers who agreed to purchase significant amounts of this marijuana, knowing of the overall plan, recognizing their own role in the plan, and aware of the existence of other participants, are part of the conspiracy. See United States v. Marsh, 747 F.2d 7, 13 (1st Cir.1984); United States v. Bates, 600 F.2d 505, 509 (5th Cir.1979). Root does not deny that he knew of the overall plan, that he knew many of the participants, or that he knew of the role in the plan played by purchasers. Rather, he claims that the government failed to prove he ever agreed to buy any marijuana, and the government does not claim he played any role other than that of a purchaser.
 
 In evaluating Root's claim we must
 
 50
 consider the evidence as a whole, taken in the light most favorable to the Government, together with all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt.
 
 
 51
 United States v. Patterson, 644 F.2d 890, 893 (1st Cir.1981). Applying this standard we believe the jury could have found that Root agreed to purchase the marijuana.
 
 
 52
 The government presented evidence that can be taken as showing the following. Before going to Bangor, defendants Michael Abell and Robert Byers telephoned defendant John Sachs, informing him that there was "grass" in Maine. Sachs said that he would look around to see if he could find some purchasers. Sachs arrived in Bangor on June 30, discussed the marijuana with Abell and Byers, and told them he had some people coming to Maine. On July 1, Sachs called Root, a friend of his. Later that same day, Root arrived in Bangor, and checked into the same hotel where Sachs, Byers and Abell were staying. The three men met with Root, and tried to talk to him, but left when it became clear that Root was "too drunk to talk to." Later that evening, Byers told another defendant, Walter Wendolkowski, "I have one guy here who wants to look at some stuff tomorrow," and assured his partner that the purchaser could "do COD" [i.e., pay cash]. The next day Root, after visiting Wendolkowski's hotel room--a critical hub of conspiratorial activity that weekend--accompanied Abell, Byers, Wendolkowski and Sachs to visit a secret cache of marijuana. Abell testified that the purpose of this trip was to give Sachs and Root an idea of the quality of the marijuana, that Root was in Bangor to buy marijuana, and that "Sachs was the middleman selling the marijuana to ... Root." While examining the marijuana, Root made comments about its quality. Abell further testified that Root told him he was "thinking about" buying the marijuana. The next day, Sachs told Abell that "my man [whom the jury could presume was Root] is playing hard to get," and that his "guy said it smelled too musty." When asked by another conspirator whether his "man" had money, Sachs was overheard by DEA surveillance officers as saying either "he has $30,000" or "he has $300,000." On July 4, Root was still in Bangor. When questioned by DEA agents (who had already arrested Sachs), Root claimed that "he had come to Maine to see John Sachs, his favorite bartender, and to have some lobster."
 
 
 53
 These facts are sufficient, in our view, to warrant the jury's finding that Root agreed to purchase marijuana. When coming to Bangor, he undisputedly had at least a rough idea of the scope of the selling effort and overall distribution plan. See Marsh, 747 F.2d at 13. He met with many of the other participants. The evidence recited would allow the jury to find that he at least agreed conditionally to "purchase the marijuana with an intent to distribute it"--i.e., he agreed to buy it if the quality was adequate. But agreement to buy that is conditional is nonetheless for conspiracy purposes an agreement to buy, at least as long as the potential buyer believes the condition likely to be fulfilled. See United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (conspiracy to assault even though conspirators agreed to assault only if their efforts to swindle the victims failed); United States v. Grassi, 616 F.2d 1295, 1302 (5th Cir.) ("It is true that the [marijuana] importation was to occur only if [the defendants] became satisfied that they were not dealing with police, but such a proviso is like any condition in an agreement. That the agreement was subject to a condition does not make it any less an agreement."), reh. denied, 624 F.2d 1098 (5th Cir.), cert. denied, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980); Note, "Conditional Objectives of Conspiracies," 94 Yale L.J. 895 (1985) (noting that virtually all agreements are, to some extent, conditional; test for conspiratorial liability should focus on subjective or objective likelihood that condition will be fulfilled). Here, the evidence that Root came to Bangor the same day he was summoned, brought a large amount of cash, held numerous discussions, and was still in Bangor at least two days after he had seen the marijuana, is a sufficient basis for concluding that the "quality" condition was unlikely to prove a serious impediment to the plan. These facts permit, at least, a reasonable inference that Root believed the condition would likely be fulfilled; and this belief is sufficient, under the circumstances, to show agreement on his part to join the distribution plan. See Grassi, 616 F.2d at 1302; Note, supra, at 906. Root's statements to the effect that the marijuana was too "musty" could arguably show his later withdrawal from the conspiracy. But the jury need not have concluded even this. It might have believed the statement showed an effort to haggle over price, a dickering over the precise terms of the exchange, just as partners may continually readjust the terms of their ongoing venture without calling a halt to the partnership. And such interpretation is plausible, and within the range of a lawful jury inference, given Root's continued presence in Bangor, and evidence that Sachs had said "his man" was "playing hard to get" (emphasis added). Since we conclude that the jury could have inferred an agreement to buy, we need not decide whether Root's continued presence in Bangor on July 4 allows the jury to infer that he had actually bought the marijuana.
 
 
 54
 7. Other Arguments.
 
 
 55
 a. Appellants Anthony Anello, Daniel Duval, and Fred Verderame argue that the district court should have given a "lesser included defense" instruction to the jury. If defendants mean an instruction that would have allowed the jury to convict for conspiracy to possess "less than 1,000 pounds" with intent to distribute, the conclusive answer to their argument is that the court gave precisely this instruction. If defendants mean that the court should also have given an instruction that would have allowed the jury to convict for conspiracy simply to possess a "measurable amount" with no intent to distribute, see 21 U.S.C. Sec. 844 (simple possession), the conclusive answer is that the evidence did not warrant such an instruction. It showed beyond doubt that the defendants agreed to possess more than simply "a measurable amount" for personal consumption: indeed, police arrested these three defendants in or near a truck filled with more than one ton of marijuana. See United States v. Henley, 502 F.2d 585, 586 (5th Cir.) ("The overwhelming evidence of possession of more than seven tons of marijuana justified the court's refusal to instruct the jury on the lesser included offense of simple possession"), reh. denied, 505 F.2d 1304 (5th Cir.1974); United States v. Marin, 513 F.2d 974, 977 (2d Cir.1975) (where "evidence pointed to the conclusion that [defendant] planned to distribute the cocaine, not merely possess it," lesser included instruction on simple possession was not warranted); see generally Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (lesser included offense instruction need not be given where not warranted by the evidence).
 
 
 56
 b. Defendant Wendolkowski argues that the court erred in giving its instruction on multiple conspiracies. We find no error, however; the court gave an instruction that was, in substance, what the defendants requested. See United States v. Gibson, 726 F.2d 869, 874 (1st Cir.) ("The trial court's charge to the jury need not follow the exact form and wording of the defendant's proposed instructions."), cert. denied, --- U.S. ----, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984).
 
 
 57
 c. Having considered defendants' remaining arguments in light of the record, we find them without merit.
 
 The judgments of the district court are
 
 58
 Affirmed.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation