January 20, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1772

UNITED STATES,

Appellee,

v.

GEORGE A. MORAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, U.S. District Judge]

Before

Selya, Circuit Judge,

Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.

James L. Sultan with whom Margaret H. Carter and Rankin & Sultan

were on brief for appellant.
George W. Vien, Assistant United States Attorney, with whom A.

John Pappalardo, United States Attorney, and Heidi E. Brieger,

Assistant United States Attorney, were on brief for appellee.

BOUDIN, Circuit Judge. Appellant George Moran and two

co-defendants were convicted by a jury, after a joint trial,

of various drug offenses. Moran was found guilty of

conspiring to distribute cocaine and was acquitted on two

other counts charging him with specific acts of distribution.

All of the defendants have appealed, but the evidence and

issues relating to Moran differ from those concerning the

other defendants and we decide his case separately.

Concluding that the evidence was sufficient to sustain

Moran's conviction for conspiracy and finding no other

errors, we affirm.

The procedural history can be briefly stated. On

August 9, 1990, Moran and a number of others were indicted

under 21 U.S.C. 846 for conspiring to distribute cocaine

and, in other counts pertaining to one or more of the

defendants, with distribution and related crimes. The co-

conspirators charged in the umbrella conspiracy count

included Moran, the alleged ringleader Hobart Willis, and

others. Before trial, Willis and three others pleaded

guilty. Moran and two other defendants were tried in

February 1991 and convicted on one or more counts. This

appeal followed.

I.

Moran's central argument on appeal is the often made,

but rarely successful, claim that the evidence was inadequate

-2-

to support the verdict against him. In appraising such an

argument, we "assess the sufficiency of the evidence as a

whole, including all reasonable inferences, in the light most

favorable to the verdict . . . ." United States v. Lopez,

944 F.2d 33, 39 (1st Cir. 1991). So viewed, we ask "whether

a rational trier of fact could have found the defendant

guilty beyond a reasonable doubt." Id. In general, issues

of credibility are resolved in favor of the verdict. Id.

"The evidence . . . need not exclude every reasonable

hypothesis of innocence; that is, the factfinder may decide

among reasonable interpretations of the evidence." Id.

In this case Moran was tried on the charge, among

others, that he conspired with Willis and his co-defendants.

The "essence" of conspiracy is an agreement to commit a

crime, Ianelli v. United States, 420 U. S. 770, 777 (1975),

here, an agreement between Moran and others to distribute

drugs. Such an agreement may, of course, be inferred from

other evidence including a course of conduct. United States

v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992). More than

that, while the term "agreement" is customarily used in

defining conspiracy and is properly employed in jury

instructions, the agreement of the defendant with others may

be implicit in a working relationship between the parties

that has never been articulated but nevertheless amounts to a

joint criminal enterprise.

-3-

In this case, taking the evidence most favorably to the

government, the jury could have found from direct testimony,

telephone recordings and other evidence that Willis was

engaged in a drug distribution conspiracy with various

persons during 1988. As to Moran, the evidence against him

came almost entirely from one Paul Callahan, who cooperated

to some extent with the Drug Enforcement Administration.

Callahan's trial testimony came freighted with his long

criminal record, admissions that he procured false testimony

in other proceedings, and his incentive to favor the

government in order to secure favorable treatment for

himself. Nevertheless, his testimony was not incredible, was

corroborated on certain limited points, and was essentially

uncontradicted. Thus the jury was entitled to accept some or

all of Callahan's testimony.

According to Callahan, he first met Moran in 1981 but

had no further contact with him until June or July 1988 when

he had a friend give Moran his beeper number. Callahan then

met with Moran and sought to purchase cocaine from him in a

substantial amount. Moran replied that he would contact the

"fat man" (understood by Callahan to be Willis) with whom

Moran said he was dealing at the time. At their next

meeting, Moran told Callahan that the fat man's prices were

too high but that Moran had another source in the North End.

Moran also said that he was going to try to get a cheaper

-4-

price from "Mary," a friend of the fat man later identified

by Callahan as a member of Willis' ring. Subsequently,

Callahan and Moran met again and Callahan purchased 500 grams

of cocaine from Moran, after testing it for purity.

Some weeks later, Callahan again contacted Moran, a

further meeting ensued, and Moran told Callahan--in

Callahan's words--that he (Moran) was "still looking in to

ingratiate with the fat guy." At the next meeting, Moran

offered a package of what Callahan took to be cocaine; Moran

explained that it came from the fat guy. The contents had a

diesel smell and Callahan rejected the package on the ground

that his own customers would not accept it. Moran left and

then returned several hours later with a kilo of cocaine from

an unidentified source. Callahan tested the new package and

purchased a half kilo.

The final evidence relating directly to Moran involved

two telephone calls between him and Callahan in October 1988.

The first call was not tape recorded. According to Callahan,

Moran complained during the call that federal agents were

scrutinizing him. On cross-examination Callahan indicated

that Moran also said during the call, "I saw the Pillsbury

Boy a few days ago, but that was just to say hi. . . . I

don't have nothing to do with those guys." Callahan told the

jury that the Pillsbury Boy was Willis.

-5-

The second conversation occurred a week later, it was

tape recorded with DEA assistance, and the recording was

offered at trial. In this conversation Moran, referring to

his prior questioning by federal agents, said that it had

occurred because the agents had seen him with "fatso" two or

three times. Callahan said he had heard that the fat guy was

being scrutinized by law enforcement agents and Moran

replied, "Oh, my God. Unbelievable. I already told him and

his first lieutenant, I says, I think somebody made you

expendable." At trial Callahan identified the first

lieutenant as Mary. Callahan concluded the taped

conversation by asking Moran, "Can we do some business?" and

Moran essentially agreed (although no evidence of further

transactions between them was offered).

This, omitting a few intervening conversations between

Moran and Callahan that add nothing pertinent, is the gist of

the evidence against Moran. The jury, after hearing this

evidence and evidence of Willis' ring, acquitted Moran of the

two distribution counts based on the sales to Callahan but

convicted him of conspiracy. The reason for the discrepancy

is unclear. Possibly the jury hesitated to rely solely upon

Callahan to prove the sales, but thought that the tape of the

second conversation confirmed Moran's relationship with

Willis regarding drug distribution. But the discrepancy does

not matter. The question presented now is whether, having

-6-

heard the evidence, including nuances and intimations that a

cold record cannot capture, a rational jury could find beyond

a reasonable doubt that Moran was guilty of conspiracy.

No court lightly overturns a jury verdict on the ground

that the jury lacked sufficient evidence, for the jury's

central role and competence is to weigh the evidence and find

the facts. Yet the issue here, or at least the aspect we

find troubling, actually poses the "legal" question whether

the conduct the jury could reasonably have found to have

occurred amounts to a conspiracy under the statute. In our

view, the jury here had no rational basis to infer, as it

often may in conspiracy cases, that the defendant was

effectively an employee or a formal "share partner" in the

ring. The most that the jury could find without sheer

speculation was that the relationship was what was portrayed

on the surface. At this point we are driven back to first

principles to determine whether this relationship amounted to

a criminal conspiracy.

Our starting point is the legal definition of conspiracy

as an agreement by the defendant with another person or

persons to commit the crime in question. Ianelli, 420 U.S.

at 777; United States v. Glenn, 828 F.2d 855, 857 (1st Cir.

1987). The evidence in this case, taken most favorably to

the government, shows that Willis agreed to supply Moran a

package which Moran represented to be cocaine, which Moran

-7-

tendered to Callahan, and which Callahan then rejected as

tainted with a diesel smell. This connection between Moran

and Willis is bolstered, or so the jury could have found, by

Moran's prior use of Willis as a source of supply, by Moran's

unsuccessful initial effort to buy drugs from Willis for

Callahan, by Moran's desire to ingratiate himself with

Willis, by Moran's encounters with Willis and Mary and by

Moran's knowledge that Willis was under federal scrutiny. On

appeal, the government argues that the evidence surely

demonstrates a conspiracy either as charged (with Willis and

others) or, at the very least, between Moran and Willis.

An agreement surely existed between Willis and Moran

relating to drugs. But if the evidence showed only an

agreement by Willis to sell drugs to Moran, it would not

necessarily show them to be co-conspirators in drug

distribution. There is substantial law, including cases in

this circuit, that a single drug sale does not automatically

make buyer and seller co-conspirators. United States v.

DeLutis, 722 F.2d 902, 906 (1st Cir. 1983) (collecting

cases). This "rule" in varying forms prevails or has been

intermittently adopted in a number of circuits, including the

Second, Fifth, Sixth, Seventh and Eighth. E.g., United

States v. Douglas, 818 F.2d 1317, 1321 (7th Cir. 1987) ("a

mere buyer-seller relationship, without more, is

inadequate").

-8-

Surprisingly the reason for excluding such buyer-seller

cases from the definition of conspiracy is not wholly clear,

and some explanation is needed since even an unplanned sale

involves an agreement between seller and buyer and the

offense of drug distribution (at least by the seller). Some

have thought it to follow from the so-called Wharton rule,

now much reduced in force by Iannelli v. United States, 420

U.S. 770 (1975), that a crime legally requiring a plurality

of actors (e.g., dueling) should not have a conspiracy charge

superimposed upon it. Other courts have felt that a single

purchase and sale do not involve the union of two

participants in a manner that increases either the likelihood

that the individual crime will be committed or that the two

will extend their joint endeavor to new crimes. The latter

explanation has force in the case of an unplanned spot sale

with no agreement beyond that inherent in the sale. It makes

less sense where the agreement is to make a sale at a future

point, an agreement that does increase the likelihood that

the crime will be committed. Yet even in the latter case,

the transaction may seem to some to lack the quality of

jointness--the hallmark of conspiracy--in the sense that

seller and buyer are not part of the same criminal

enterprise.

This may seem a fine point but it is one that goes to

the root of conspiracy law: conspiracy is treated as a

-9-

separate crime because of the jointness of the endeavor. A

multiplicity of actors united to accomplish the same crime is

deemed to present a special set of dangers, either that the

criminal end will be achieved, Callanan v. United States, 364

U.S. 587, 593 (1961), or that the conspiracy will carry over

to new crimes, United States v. Rabinowich, 238 U.S. 78, 88

(1915), or both. See 2 W. LaFave & A. Scott, Substantive

Criminal Law 6.4(c) (1986) (summarizing the rationale). It

is these dangers stemming from jointness that justify early

intervention to stem conspiracies even before they rise to

the level of attempts and to impose a separate punishment on

the conspirators even if they fail to achieve their ends.

This special set of dangers is present if two individuals

agree that one of them will sell cocaine and the other will

assist; it is arguably not present if one merely sells the

same cocaine to another without prearrangement and with no

idea of or interest in its intended use. In the latter case,

both may be guilty--one of distribution and the other of

possession--but without more they are not conspirators.

Glenn, 828 F.2d at 858.

At some point the relationships converge. A pattern of

sales for resale between the same persons, together with

details supplying a context for the relationship, might well

support a finding of conspiracy. Id. at 857-58. Even a

single sale for resale, embroidered with evidence suggesting

-10-

a joint undertaking between buyer and seller, could suffice.

United States v. Carbone, 798 F.2d 21, 27 (1st Cir. 1986).

Common knowledge, interdependence, shared purpose and the

other ingredients of a conspiracy are matters of degree.

Almost everything in such a case depends upon the context and

the details. The evaluation of the facts is entrusted

largely to the jury.

In this case, taking a practical rather than a formal

view of the matter, we believe that the jury was entitled to

conclude that the arrangement amounted to a conspiratorial

agreement between Willis and Moran for the distribution of

drugs. Based on testimony that the jury was entitled to

credit, Moran (according to Callahan) admitted that he was

dealing with Willis, an admission suggesting that Willis had

supplied Moran with drugs in the past. Moran then turned to

Willis as his first choice of supplier in seeking to fill

Callahan's first order. Although Willis' price was too high

for this first transaction, for the second one Moran--after

expressing his desire to bolster his relationship ("to

ingratiate with the fat guy")--again turned to Willis. This

time Moran did acquire from Willis a resale sized quantity,

even though Callahan then rejected the shipment. This

picture of a continuing sale-for-resale relationship, even if

Willis was not the exclusive supplier, was reinforced by

Moran's other contacts with Willis and knowledge of his law-

-11-

enforcement jeopardy. See United States v. Anello, 765 F.2d

253, 261 (1st Cir.), cert. denied, 474 U.S. 996 (1985).

We think that a realistic appraisal of Moran's and

Willis' relationship would permit a jury to find that it

amounts to an implicit agreement and comprehends the

continuing supply by one to the other of drugs for resale to

customers. See United States v. Geer, 923 F.2d 892, 895 (1st

Cir. 1991). Even though Moran was not an employee nor did

Willis and Moran formally divide the profits, in this case a

jury could conclude that both Willis and Moran had an ongoing

stake in the success of Moran's own sales of the drugs Moran

acquired from Willis. See Glenn, 828 F.2d at 857-58. From

those sales Moran could profit directly and Willis indirectly

through the maintenance of the drug distribution channel

crucial for a drug network. See generally Direct Sales Co.

v. United States, 319 U. S. 703, 717 (1943). Such an

arrangement, we think, is not only an agreement within the

ordinary conspiracy-law ambit but is one that unites two

participants in seeking to accomplish the crime of

distribution and involves both of the dangers of

conspiracy--increased likelihood of success and extension to

other crimes--to which the cases advert. We think that the

pragmatic approach of Direct Sales in defining conspiracy

foreshadows the result in this case and, given Congress'

intent to stamp out drug transactions, it certainly did not

-12-

mean to narrow the conspiracy concept when it enacted 21

U.S.C. 846, the statute involved in this case.

We leave for another day the lesser variations on the

same theme. Obviously a single sale in resale sized

quantities presents one problem and an advance agreement to

make a single sale involves another. Where one draws the

line is more a matter of discerning congressional policy and

intent than an exercise in logic, and the case-by-case

approach is for the present the wisest course. As for the

classic single sale--for personal use, without

prearrangement, and with nothing more--the precedent in this

circuit as well as others treats it as not involving a

conspiracy. In such cases the jointness element is clearly

at a minimum, if it exists at all. Where nothing more is

involved, we reaffirm existing authority that such a case is

not a conspiracy.

II.

Moran's remaining arguments are less formidable than his

attack on the sufficiency of the evidence. Moran first

argues that even if the evidence was adequate to prove a

conspiracy between Willis and Moran, it was not sufficient to

prove Moran to be a member of the larger conspiracy charged

in the indictment. This variance, he argues, prejudiced him

by associating him with more powerful and extensive evidence

-13-

against other defendants. We agree that there was probably a

variance but find that it was not prejudicial.

The indictment charged a single drug distribution

conspiracy, naming as co-conspirators Willis, Moran, six

other named defendants, and "other persons both known and

unknown to the Grand Jury . . . " At trial much of the

evidence related to the two other defendants who pleaded not

guilty and to Willis and his relations with defendants other

than Moran. The references of Mary to one side, nothing

linked Moran to any of the ring members other than Willis or

any of the transactions charged elsewhere in the indictment

other than Moran's own sales to Callahan.

On this record, it is true that the evidence pointing to

a Willis-Moran conspiracy is far stronger than evidence of

conspiracy between Moran and the Willis ring as a whole. A

very serious problem would be presented if the jury had held

Moran liable for other substantive crimes committed by the

ring. Compare Glenn. The situation is different where the

government charges a defendant with a crime (here, conspiracy

to distribute) but the facts proven at trial vary somewhat

from those charged in the indictment. In that case, it is

settled law that a conviction for the crime charged will be

affirmed unless the variance as to the facts is shown to have

prejudiced the defendant. Berger v. United States, 295 U.S.

78 (1935); Fed. R. Crim P. 52(a)(variance not affecting

-14-

substantial rights may be disregarded). Convictions are

often sustained under this principle where the indictment

alleges a single conspiracy but multiple conspiracies are

actually proved. E.g., United States v. Sutherland, 929

F.2d 765, 772 (1st Cir.), cert. denied, 112 S. Ct. 83 (1991).

In this case, Moran does not and could not claim that

the variance deprived him of notice of the charge adequate to

prepare a defense. Rather he contends that the disparity in

evidence--specifically, the array of witnesses and tape

recordings incriminating other defendants--created a

"spillover" effect that enhanced the narrower case against

him. See Sutherland, 929 F.2d at 772. The enhancement may

be assumed; motions for severance are routinely made in

conspiracy cases, partly to escape this taint. The question

is whether the impact threatened to deprive defendant of a

fair trial. We conclude that it did not.

Most of the evidence concerning Moran was distinctly

different from the evidence against others. It derived from

Callahan's testimony and concerned his transactions with

Moran. Similarly, Moran's relationship with Willis was based

upon Callahan's description buttressed by Moran's own tape

recorded statements. The distinct separation between this

evidence and evidence of other Willis-related activities

diminished the risk of jury confusion. Indeed, on these

facts the risk appears to have been minimal compared to the

-15-

usual mass conspiracy case. Under these circumstances we do

not think the apparent variance even arguably threatened

Moran's right to a fair trial.

Finally, Moran argues that error inheres in a

supplementary instruction given to the jury during its

deliberations. Jury deliberations began on February 14,

1991, and the next day the jury sent in the following written

question, as described by the trial judge:

The indictment states, quote, David
Elwell, Richard Morretto and George
Moran, defendants, combined, conspired
and agreed with each other -- underlined
"with each other" -- and with other
persons, both known and unknown to the
grand jury, close quote. Does the
statement mean these three -- and
circled -- people conspired with each
other -- and "with each other" is again
underlined. Your instruction seems to be
different from the indictment. Signed by
the foreperson.

The judge then re-instructed the jury, reminding them that

"first, remember the indictment is only the charge, the

accusation. It is not evidence. It is not a statement of

the law. On the other hand, my instructions are a statement

of the law and are binding on you." The judge then repeated

his prior instructions on conspiracy (two or more persons,

agreement to commit crime charged, defendant's knowledge of

unlawful purpose and knowing joinder). Within the hour, the

jury returned its verdict, including the conspiracy

conviction of Moran.

-16-

On appeal, Moran agrees that "[v]iewed in isolation, the

judge's instructions were unobjectionable," and this is

clearly so: the response to the jury's question was clear,

correct, and precisely answered the question posed. Moran

argues, however, that in context the instruction could have

led the jury to believe that it could disregard the

indictment entirely and convict the defendant of any

conspiracy it chose. There is a distinct possibility, says

Moran, that the jury convicted him of a conspiracy not

charged such as a conspiracy with Callahan or "a conspiracy

with Willis, different from that involving Moretto, Polito,

and Elwell."

Moran's counsel at trial did not object to the

supplementary instruction and any objection is therefore

waived absent a showing of serious prejudice. United States

v. Maraj, 947 F.2d 520, 525 (1st Cir. 1991). No such showing

has been made here. Further, we do not think that the

instruction invited the jury to disregard the charge in the

indictment; indeed, the supplementary instruction reminded

the jury that the agreement here charged was "to possess with

intent to distribute cocaine." As for the suggestion that

the jury convicted Moran for such a conspiracy with Willis,

rather than with Willis and others in his ring, this may well

be so. But as cases like Sutherland show, such an outcome is

-17-

not conviction for a "different crime" than that charged but

is merely a permissible variance.

Affirmed.

-18-